Bradley W. CALDWELL, Plaintiff,

v.

Jo Anne B. BARNHART, Commissioner of the Social Security Administration, Defendant.

No. 4:04–cv–00241–WGH–DFH.

United States District Court,
S.D. Indiana,
New Albany Division.

May 11, 2006.

Larry J. Schad, Schad & Palmer, New Albany, IN, for Plaintiff.

Thomas E. Kieper, United States Attorney's Office, Indianapolis, IN, for Defendant.

## MEMORANDUM DECISION AND ORDER

HUSSMANN, JR., United States Magistrate Judge.

Plaintiff, Bradley W. Caldwell, seeks judicial review of a final decision of the agency, which found him not disabled and, therefore, not entitled to Supplemental Security Income ("SSI") under the Social Security Act ("the Act"). 42 U.S.C. § 1382(c). The court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g).[1]

For the following reasons, the decision of the Commissioner is **REMANDED**.

### I. Statement of the Case

On July 12, 2002, plaintiff filed an application for SSI payments. The claim was denied initially and on reconsideration and a request for hearing was filed on June 5, 2003. Plaintiff, medical advisor Dr. Suzann O'Koon, and vocational expert Sharon Lane appeared and testified at the hearing held on April 20, 2004. Larry Schad, an attorney, represented plaintiff at this hearing. The Administrative Law Judge ("ALJ") issued a decision on May 24, 2004. The ALJ found that the plaintiff was not disabled. Specifically, the ALJ found that the plaintiff had not engaged in substantial gainful activity since the onset of his disability; that he had affective and personality disorders which were severe; that his impairments did not meet or medically equal one of the listed impairments; that he retained the residual functional capacity to perform simple, unskilled, repetitive tasks at any exertional level involving little or no interaction with the general public or coworkers and no close supervision; and that he had no past relevant work. The

ALJ then concluded that plaintiff, a younger individual with a high school education in the special education program, could perform such work as a cleaner, farm laborer, grounds worker or night stocker at the medium exertional level; cleaning jobs at the light exertional level; and farm laborer and night stocker at the heavy exertional level.

On November 26, 2004, plaintiff was notified by the Appeals Council that the decision of the ALJ was affirmed.

Plaintiff filed his Complaint for judicial review on December 17, 2004, in this court.

### II. Standard of Review

An ALJ's findings are conclusive if they are supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); see also *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir.1997). This standard of review recognizes that it is the Commissioner's duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide questions of credibility. *Richardson*, 402 U.S. at 399–400, 91 S.Ct. 1420. Accordingly, this court may not reevaluate the facts, weigh the evidence anew or substitute its judgment for that of the Commissioner. *See Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir.1999). Thus, even if reasonable minds could disagree about whether or not an individual was "disabled," the court must still affirm the ALJ's decision denying benefits. *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir.2000).

1. This matter is before this Magistrate Judge pursuant to the consent of counsel and the order of reference entered by the Honorable David F. Hamilton, District Judge, on August 30, 2005. (Docket No. 16).

## III. Standard for Disability

In order to qualify for disability benefits under the Act, plaintiff must establish that he suffers from a "disability" as defined by the Act. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations set out a sequential five-step test the ALJ is to perform in order to determine whether a claimant is disabled. *See* 20 C.F.R. § 416.920. The ALJ must consider whether the claimant: (1) is presently employed; (2) has a severe impairment or combination of impairments; (3) has an impairment that meets or equals an impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) is unable to perform his past relevant work; and (5) is unable to perform any other work existing in significant numbers in the national economy. *Id.* The burden of proof is on plaintiff during steps one through four, and only after plaintiff has reached step five does the burden shift to the Commissioner. *Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir.2000).

## IV. Issues Presented

Plaintiff raises the following issues in his brief:

1. Did the ALJ err at Step 3 of the sequential evaluation process when he concluded that the plaintiff did not meet Listing of Impairment 12.04?

2. Did the ALJ err at Step 5 of the sequential evaluation process when he concluded that the plaintiff had the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances?

## V. Analysis

**Issue 1: Did the ALJ err at Step 3 of the sequential evaluation process when he concluded that the plaintiff did not meet Listing of Impairment 12.04?**

At the time of the ALJ's decision, plaintiff was a 21 year old individual with a high school education in the special education program. He alleges that he was disabled on July 12, 2002 (when he was 19). It is uncontested that no physical disabilities exist at all and plaintiff can perform a full range of work at all exertional levels from a physical or exertional point of view. (R. 415–16). It is also uncontested that he has no significant vocational or relevant past work experience, having worked essentially only one job for two months or less and another job for approximately two weeks. (R. 418). If the plaintiff is disabled, it is because of his psychological condition.

Plaintiff first argues that he meets Listing of Impairment 12.04, which provides as follows:

12.04 *Affective Disorders:* Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A. Medically documented persistence, either continuous or intermittent, of one of the following:

1. Depressive syndrome characterized by at least four of the following:

a. Anhedonia or pervasive loss of interest in almost all activities; or

b. Appetite disturbance with change in weight; or

c. Sleep disturbance; or

d. Psychomotor agitation or retardation; or

e. Decreased energy; or

f. Feelings of guilt or worthlessness; or

g. Difficulty concentrating or thinking; or

f. Thoughts of suicide; or

i. Hallucinations, delusions or paranoid thinking; or

2. Manic syndrome characterized by at least three of the following:

a. Hyperactivity; or

b. Pressure of speech; or

c. Flight of ideas; or

d. Inflated self-esteem; or

e. Decreased need for sleep; or

f. Easy distractibility; or

g. Involvement in activities that have a high probability of painful consequences which are not recognized; or

h. Hallucinations, delusions or paranoid thinking;

OR

3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration;

OR

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

After plaintiff's hearing before the ALJ, his treating physician, Dr. Peters, received a form drafted on plaintiff's counsel's letterhead which spelled out the requirements of Listing 12.04. Plaintiff's attorney asked the doctor to circle the answers that applied to plaintiff based upon Dr. Peters' prior treatment of plaintiff. The doctor completed the questionnaire, and it was made part of the evidence in the record. (R. 365–72).

■ Dr. Peters' answers, if accepted, establish that plaintiff's condition met the listing. Plaintiff argues that under 20 C.F.R. §§ 404.1527(b) and 416.927(b), the ALJ is required to evaluate every medical opinion. Moreover, if the medical source is a treating medical provider, the ALJ must provide good reasons for failing to give that opinion controlling weight. Plaintiff argues that the error committed is that the ALJ did not give controlling weight to Dr. Peters' assertions that plaintiff met the listing at 12.04.

This court's review of the ALJ's decision finds that the ALJ did specifically mention the questionnaire and the mental capaci-

ties evaluation form that Dr. Peters submitted. (R. 19). The ALJ also asked questions of medical expert Dr. Suzann O'Koon concerning this listing. (R. 436–37). However, and despite these pieces of evidence, the ALJ failed to specifically address whether or not the plaintiff met the elements of Listing 12.04. Rather, the ALJ concluded that the restrictions found by Dr. Peters are "within the parameters of the residual functional capacity noted below." (R. 19). The plaintiff's residual functional capacity, as found by the ALJ, allowed him to "perform simple unskilled repetitive tasks at any exertional level involving little or no interaction with the general public or coworkers and no close supervision." (R. 21).

This court concludes that when the plaintiff specifically raises the issue of whether he meets a particular listing and provides a statement from the treating physician that reflects that the plaintiff meets the medical conditions described within a listing, the ALJ must at least articulate that he considered the listing and give reasons why he rejected the treating physician's evidence. Recent cases from the Seventh Circuit hold that where the ALJ omits reference to the applicable listing and provides nothing more than a superficial analysis, reversal and/or remand is required. *Brindisi v. Barnhart,* 315 F.3d 783, 786–87 (7th Cir. 2002); *Scott v. Barnhart,* 297 F.3d 589, 595–96 (7th Cir.2002).

Here, in his opinion, the ALJ did not mention the specific listing even though it was brought to his attention by the doctor's evidence specifically identifying the listing. The ALJ did not discuss or analyze why Dr. Peters' observations and records were internally inconsistent or conflicted with other evidence of record, or were otherwise not entitled to controlling weight as case law suggests he may do. *Clifford v. Apfel,* 227 F.3d 863, 870 (7th

Cir.2000); *Dixon v. Massanari,* 270 F.3d 1171, 1177 (7th Cir.2001). Rather, the ALJ here merely superficially concluded that Dr. Peters' observations were "within the parameters of the residual functional capacity noted below." (R. 19). It must be noted that opinions of treating physicians on the degree of a medical condition are generally—though not always—given controlling weight. *Clifford,* 227 F.3d at 870.

When the ALJ's opinion does not specifically address the appropriate listing, and does not specifically address a treating physician's report that the plaintiff meets the listing, this court must review the ALJ's decision for two things. First, can we trace the path of his/her reasoning to be sure he/she actually considered that listing? If we cannot, the case should be remanded so he/she can consider the proper listing. If we can trace the path of the ALJ's reasoning and conclude that the appropriate listing was considered, then we must examine the record to see if there is other substantial evidence besides Dr. Peter's report that supports a conclusion that plaintiff does not meet the listing.

As to whether the ALJ considered the listing, two pieces of the record convince the court that the ALJ did consider Listing 12.04. The first is in the questions asked at the hearing to medical advisor Dr. O'Koon at page 435 of the hearing transcript:

EXAMINATION OF MEDICAL EXPERT BY ADMINISTRATIVE LAW JUDGE:

Q  Dr. O'Koon, you're familiar with the listing established by the Commissioner, are you not?

A I am, sir.

Q  Particularly listing 12.04. Is that correct?

A Yes, sir.

Q And that's what we'll consider this case under. Is that correct?

A Yes, sir, that and 12.08. We have a personality disorder, NOS.

Q All right. And we have bipolar disorder, NOS?

The second factor that convinces the court that the ALJ did consider the listings is found in his opinion at page 18 of the record, where the ALJ states:

Dr. O'Koon testified the medical evidence indicates that the claimant has affective disorder and personality disorder, impairments that are "severe" within the meaning of the Regulations but not "severe" enough to meet or medically equal, either singly or in combination one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4 for the period in question beginning July 2002 to the present time.

As evaluated under the "B criteria" of the Listing of Impairments, the claimant's mental impairment produces only minimal restriction of activities of daily living and moderate difficulty in social functioning. Deficiencies of concentration, persistence or pace are also mild as it regards simple 1–2–3 step jobs, and there is no history of repeated episodes of deterioration or decompensation, each of extended duration. The undersigned notes that Dr. O'Koon found no evidence to establish the presence of the "C" criteria.

Based on these two pieces of the record, and though it would have been preferable to be more specific, this court can trace the path of the ALJ's reasoning, and we conclude that he did consider the appropriate Listing 12.04 in this case.

The court then turns to the question of whether substantial evidence supports a conclusion that plaintiff does not meet the listing. The ALJ's opinion recited above indicated that the ALJ believed that plaintiff's condition did not satisfy the "B" criteria, specifically:

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

The evidence the ALJ specifically recites to in his opinion to establish that plaintiff does not meet the "B" criteria is the testimony of Dr. O'Koon. (R. 18). That testimony in its entirety is found at pages 439–449 of the record.

Dr. O'Koon does not specifically address the "B" criteria in her testimony. Dr. O'Koon's testimony in response to a question as to whether plaintiff's condition would medically meet Listing 12.04, states:

A Okay. Some of the record that we have is ups and downs, so my opinion is that he does not—we don't have a length of time to medically meet or equal a listing. We do have some decompensations expressed in the record, which is common with bipolar disorder and with medication changes. Discussing medication changes during his testimony, it's a problem to have that type—

Q Would his condition meet the C criteria?

A No, sir, it does not.

(R. 436–37).

The only other part of Dr. O'Koon's testimony that appears to address the "B" criteria is found in the ALJ's examination at pages 447–448 of the record:

Q We have no hospitalizations, here, do we?

A Not—

Q We didn't—

A Not recently.

Q Not any time recently. Is that correct?

A No, sir. '97 is the last hospitalization.

Q We have the reports, other than for a short period in October and November, possibly December of 2003, it appears that the Claimant was functioning reasonably well. Is that correct?

A Yes, sir. After he was put back on some medication.

Q There's also some indication that he was not completely compliant with medication, isn't there?

A Well, there have been days that he's missed, yes, sir.

(R. 447–48).

■ When read as a whole, Dr. O'Koon's testimony addressed one of the four "B" criteria—specifically whether the plaintiff has experienced repeated periods of "decompensation" of an extended nature. Dr. O'Koon's testimony does not address the other three "B" criteria in any manner that this court can easily trace. The ALJ's reference to the fact that no hospitalizations have occurred is, of course, of some materiality. The reference to the fact that "we have reports" (R. 447) would appear to refer to reports in evidence at the time of the hearing. These reports relating to the period of disability near July 2002 consist of the notes from Counseling Associates of Southern Indiana (R. 342–63) and a consultative examination by Dr. Larry Freudenberger, Psy.D. (R. 322–27).

A review of the records of Counseling Associates do not appear to show, as the ALJ suggests, that plaintiff was "functioning reasonably well." (R. 447). Rather, they show in September 2002 a severe stress level and a GAF score of 41–50, indicating being unable to keep a job. (R. 343–46). The next evaluation at the clinic is in October 2003—one year later. (R. 355–61). That evaluation finds a GAF of 50, with patient described as "severe—the patient struggling to find regular work." (R. 361). This is even in the face of being compliant with medication. (R. 359). The next visit to the clinic, in November 2003, shows the patient "decompensated" at that time. (R. 354). In January 2004, his condition remained "unchanged." (R. 352). In February 2004, the clinic noted only "slight improvement." (R. 351). These "reports" do not appear to support an inference that plaintiff was "functioning reasonably well." And given that these records reflect a period of serious problems from October 2002 unabated through at least February 2004, Dr. O'Koon's testimony—that there is an insufficient period of time of difficulty to meet a listing—is suspect.

It is true that Dr. Freudenberger did conduct an examination in September 2002 and did report a GAF of 65–70 at that time based on a single testing report and interview. (R. 322–41).

In summary then, in order for there to be substantial evidence to support the ALJ's conclusions that plaintiff did not meet the "B" criteria of the listing, we must find that reliance on Dr. Freudenberger's examination is substantial evidence even though the report is inconsistent with Dr. Peters' report and the contemporaneous records from the psychiatric clinic which the plaintiff attended. We also would need to conclude that reliance on Dr. O'Koon's testimony was proper even though she did not specifically address all of the "B" criteria in her own testimony, and when there are records concerning a one-year period of serious, unabated mental difficulties. While this court is keenly aware that it is not entitled to reweigh the evidence, we are not able to trace the path of the ALJ's reasoning in this case because

he does not articulate why the treating physician and contemporaneous clinical notes which appear to satisfy the "B" listings and which (as treating physician records) are to be given some deference, should be disregarded in this instance. We do not suggest that reversal will ultimately be required here, but we do conclude that when a treating physician's opinion and psychological counseling notes do appear to suggest the listing is met, and when the medical advisor at the hearing does not clearly articulate why the criteria are not met, then the court must not infer easily that substantial evidence exists from one consultative examination.

**Issue 2: Did the ALJ err at Step 5 of the sequential evaluation process when he concluded that the plaintiff had the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances?**

█ Even if this court were to conclude that the ALJ was correct in finding that the plaintiff did not meet Listing 12.04, plaintiff raises a second issue—closely related to the first. That issue is whether there is substantial evidence to support the ALJ's conclusion that the plaintiff had the ability to perform activities within a schedule, maintain regular attendance, and be punctual within normal tolerances. Plaintiff argues that none of the evidence before the ALJ supports this conclusion. Plaintiff again contends that the evidence of plaintiff's treating physician, Dr. Peters, should be given controlling weight, and that the ALJ's failure to give Dr. Peters such weight requires remand.

A review of the mental residual functional capacity evaluation by Dr. Peters shows that, as the ALJ concluded, plaintiff does have the ability to understand, remember, and carry out very short and simple instructions and to make simple work-related decisions. Dr. Peters also found that

plaintiff was markedly limited in the ability to interact with the general public, and that he does have the ability to sustain ordinary routine without special supervision.

Dr. Peters, however, had other findings that are not addressed by the ALJ. Specifically, Dr. Peters found that plaintiff had markedly limited ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (R. 370). Likewise, he was markedly limited in the ability to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral abnormalities; and to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. Dr. Peters pointed out that plaintiff has struggled despite multiple attempts to address his employment issues despite medication and supportive psychotherapy. He noted that he had failed several attempts at employment thus far. (R. 372).

In his decision, the ALJ concluded that the limitations that he found to have existed were included within the records of Dr. Peters at Exhibits 15, 16 and 17. (R. 19–20). A review of those documents (R. 342–75) shows that as of November 20, 2001, Dr. Peters concluded that based upon a mental status examination, plaintiff had adequate judgment, superficial insight, no psychotic features were identified, his concentration was fairly intact, he reported no side effects with his medication, and appeared to "enjoy working on cars and has some good friendships with his younger brother and another same-age male peer." (R. 347). The diagnosis there was that plaintiff was functioning at a 55–60 DSM level.

However, by September 6, 2002 (approximately 90 days after the onset date

claimed by plaintiff), Dr. Peters and his associates concluded that plaintiff had a bipolar disorder, and that his current functioning level was between 41 and 50, and that he had functioned at that level for the last one year. (R. 343–44). Records of Dr. Peters after the initial visits include an evaluation on October 4, 2003, one year later. (R. 359–61). Dr. Peters evaluated plaintiff as having severe difficulties, "the patient struggling to find regular work," and assessed a GAF score of 50, which means that he was having serious symptoms and a serious impairment in occupational functioning. (The GAF scale describes this level of functioning to include "unable to keep a job.") Another evaluation some three weeks later on October 24, 2003, assessed plaintiff's functioning level at a GAF score of 41 to 50 (R. 355), again indicating serious impairments in occupational functioning. An evaluation on November 26, 2003, found plaintiff to be "decompensated." (R. 354). On January 3, 2004, plaintiff remained unchanged from the prior visit. (R. 352). On February 10, 2004, there was only slight improvement, although it did indicate that plaintiff and a friend were building a "hopper" for a car show. (R. 351).

It appears then that the ALJ's assessment of Dr. Peters' questionnaire and records fail to specifically address what seems to be Dr. Peters' well-documented assessment that plaintiff was markedly unable to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to accept criticisms and respond appropriately to criticisms from supervisors; to get along with coworkers and peers without distracting them; and to maintain socially appropriate behavior and adhere to the basic standards of neatness and cleanliness.

In order to disregard Dr. Peters' opinions on this fact, the ALJ must have articulated some other piece of evidence which would establish that he could maintain regular attendance and a regular schedule.

In this case, the ALJ relied on the testimony of medical expert Dr. O'Koon. Dr. O'Koon's testimony in response to a question as to whether plaintiff's condition would medically meet Listing 12.04, states:

A Okay. Some of the record that we have is ups and downs, so my opinion is that he does not—we don't have a length of time to medically meet or equal a listing. We do have some decompensations expressed in the record, which is common with bipolar disorder and with medication changes. Discussing medication changes during his testimony, it's a problem to have that type—

Q Would his condition meet the C criteria?

A No, sir, it does not.

(R. 436–37). Dr. O'Koon went on to address several other aspects of her opinion. However, a review of the transcript of her testimony (R. 434–50) does not show that Dr. O'Koon specifically addressed the issue of whether plaintiff had the ability from a medical perspective to maintain necessary regular attendance.

The testimony of the vocational expert is clear that any of the jobs that the vocational expert testified to require that plaintiff would "have to sustain regular attendance and be able to concentrate on his job tasks." (R. 454). Because Dr. O'Koon did not specifically address that issue, and because the ALJ in his opinion does not specifically address the regular attendance issue, we are unable to discern whether the ALJ rejected Dr. Peters' opinion on this fact or simply failed to take this factor into consideration in his analysis. In this case, if plaintiff is unable to maintain regular attendance because of his psychological difficulties, he is unable to perform any of the jobs which the ALJ concludes that he is able to perform. The evidence before

the ALJ includes a physically capable 20 year old man with no physical disabilities who has attempted only two periods of employment at modest jobs, neither of which could be held for longer than two months. All of the medical testimony establishes that he has been diagnosed with a bipolar disorder. His treating physician has rendered an opinion for which there is support in the record that he is unable to maintain regular attendance. Dr. O'Koon did not specifically address that issue in her testimony. If Dr. O'Koon were to address that issue and conclude, based on her examination of the record, that plaintiff could do so, then the ALJ's decision would be supported by substantial evidence. However, should Dr. O'Koon address the issue of regular attendance and conclude, based on her examination, like Dr. Peters, that plaintiff could not maintain regular attendance, then he would be unable perform the jobs stated by the vocational expert.

Therefore, the court concludes that this matter should be remanded to address that issue as well.

## VI. Conclusion

In this case, the ALJ's decision does not specifically discuss Listing of Impairment 12.04, and we are unable to trace the path of his reasoning to a conclusion that substantial evidence exists that the plaintiff does not meet that listing. In addition, the issue of whether the ALJ properly concluded that the plaintiff has the ability to perform activities when a schedule, regular attendance and punctuality are required, requires additional review.

Therefore, this case is **REMANDED** to the Commissioner for proceedings consistent with this decision.

**SO ORDERED.**